IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS VOTINO,<br><br>          Petitioner,<br><br>        vs.<br><br>JOE A. LIZARRAGA, Acting Warden,<br>Mule Creek State Prison,[1]<br><br>          Respondent. | No. 2:10-cv-01784-JKS<br><br>MEMORANDUM DECISION |

Louis Votino, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Votino is currently in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at Mule Creek State Prison in Ione, California.  Respondent has answered, and Votino has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

The California Court of Appeal recounted the underlying facts and procedure of this case as follows:

> At 6:30 a.m. on November 7, 2004, James Brookes left his white pickup truck running as he ran back into his house to retrieve his wallet.  Brookes had orange safety vests, like those used by Caltrans workers, and plastic gloves in his truck at the time.  His neighbor's security video camera captured the theft of the truck.  The videotape showed a van driving by the Brookeses' house moments before the theft and then returning and driving away in front of Brookes's truck, which was driven away at high speed.  The van's front left fender was a different color from the rest of the van.
>
> Three weeks before the theft, the van had been sold to a person with a name nearly identical to that of [Votino's] wife.  In April 2005 a van with a front left fender a

---

[1]     Joe A. Lizaragga, Acting Warden, Mule Creek State Prison, is substituted for Michael Martel, former Warden, Mule Creek State Prison.  FED. R. CIV. P. 25(d).

different color from the rest of the van was parked outside the home of [Votino's] mother-in-law.

On November 8, 2004, a man robbed a Shell gas station clerk at gunpoint, took about $200, and left in a white pickup truck driven by another person.  The clerk was unable to identify either her assailant or the driver.  She testified the robber was short and heavyset, wore a sweatshirt with a red hood and a baseball cap underneath, and had a red and white mask covering his face.

At about 8:30 a.m. on November 9, 2004, a chunky, short Mexican male wearing a dark sweater with a white stripe, an orange construction vest with "neon" stripes, a dark baseball hat, white tennis shoes, white gloves, and a red bandana covering his face pointed a gun at a Valero gas station clerk and demanded money.  The man grabbed a cash drawer containing about $81 in cash, left the store, and climbed into the passenger side of a white pickup.  The clerk was unable to positively identify either the robber or the driver.

Marcus Hopkins, an off-duty employee, happened to be at the Valero station during the robbery and was the only eyewitness to identify [Votino] as a participant in any of the charged offenses.  His credibility was hotly contested.  Hopkins could not see the robber's face because the robber was wearing a bandana and a hat.  He followed him out of the store, saw him get into a white truck, and then got into his own truck and chased the robbers.  As the driver of the white truck tried to get away, he saw a gun hanging out the passenger window and then heard two "pops."  The chase ended when Hopkins hit a divider.

Hopkins testified he got a good look at the driver, whom he identified as [Votino].  A week after the robbery, he picked [Votino] out of one of two photo lineups.  He further testified that he was positive [Votino] was the driver, and if the police reported he had identified [Votino] as the passenger, they were mistaken.  The detective who showed Hopkins the photo lineups, however, testified that Hopkins identified [Votino] as the robber.

At roll call on November 9, 2004, Stockton police officers were informed that two male suspects using a white pickup and a firearm had robbed two gas stations.  The officers also were shown photos from the Valero surveillance video.  At about 5:40 p.m., while on patrol, two officers saw a truck they believed matched the vehicle description from the robberies and called for backup.  A high-speed chase ensued.  One of the passengers started shooting at the police officers.  As the driver tried to negotiate a turn at 70 miles per hour, he lost control and collided with a telephone pole.

Three men ran from the truck, the officers shooting at them.  Within minutes, an officer spotted [Votino] walking down the street approximately one block east of the site of the crash.  He was wearing black sweatpants, a white T-shirt, and white tennis shoes.  He was sweating profusely and appeared nervous.  A gunshot residue test was conducted on [Votino], and several consistent particles of gunshot residue were found on both of his hands.  Even though none of the officers involved in the chase was able to positively identify him, [Votino] was transported to the police department for interrogation.  Codefendant Jose Balverde was located and transported to the hospital for treatment of a

-2-

gunshot wound.  A third suspect, Aaron Woods, was interviewed the following day at a hospital emergency room, where he went for treatment of a gunshot wound.

After spending the night at the police department, [Votino] was interrogated early the following day.  He claimed he had been asleep at the time of the robbery, and he denied knowing codefendant Jose Balverde or riding in a white truck.  He insisted he had driven a minivan to McKinley Park looking for mechanics to help him with another disabled car.  He parked the van and began walking around in search of help.  Not finding anyone, he returned to the van, only to discover someone had broken into it and it would not start.  He left the park on foot to look for his friend Jerry, who lived in the neighborhood.  Shortly after hearing gunshots, he was stopped by the police.

[Votino] claimed he was wearing only a T-shirt even though it was cold outside because he had not planned to be stranded in the park and thought he had a sweatshirt in the van.  He denied that any of the clothing found in the area was his.  The police officers could not find the van in the vicinity of McKinley Park.  [Votino] suggested that the van had been stolen.

The prosecution argued that Balverde was the robber.  Woods pled guilty to one count of assault with a firearm on a police officer and admitted to personally using a firearm within the meaning of [California] Penal Code section 12022.5, subdivision (a).  The prosecution did not claim that he was involved in the gas station robberies.  Balverde and [Votino] were tried jointly.

A jury convicted [Votino] of four counts of assault with a firearm on police officers (Pen. Code, § 245, subd. (d)(1)), one count of unlawful taking or driving of a motor vehicle (Veh. Code, § 10851, subd. (a)), one count of receiving a stolen motor vehicle (Pen. Code, § 496d, subd. (a)), one count of possession of a firearm by a convicted felon (Pen. Code, § 12021, subd. (a)), one count of second degree robbery of the Valero gas station (Pen. Code, § 211), and one count of assault with a firearm on the person of another (Pen. Code, § 245, subd. (a)(2)).  Balverde also was found guilty of all counts.  The court found [Votino's] prior voluntary manslaughter conviction to be true.  He was sentenced to state prison for 22 years 4 months.

*People v. Votino*, No. C054522, 2009 WL 1900389, at *1-3 (Cal. Ct. App. July 1, 2009).

Through counsel, Votino directly appealed, arguing that: 1) the trial court erred in instructing the jury on the natural and probable consequences doctrine; 2) the evidence was insufficient to convict him as an aider and abettor under the natural and probable consequences theory of liability because the assaults were not reasonably foreseeable; 3) the court improperly restricted cross-examination of Hopkins; and 4) he was improperly convicted of both stealing and receiving the stolen truck.  The Court of Appeal reversed Votino's conviction for receiving

stolen property but otherwise affirmed in a reasoned, unpublished decision.  *Votino*, 2009 WL 1900389, at *8.

Votino filed a counseled petition for review to the California Supreme Court, in which he argued that the court erred in instructing the jury on the natural and probable consequences doctrine and that his right to confrontation was violated when the court limited his cross-examination of Hopkins.  The supreme court summarily denied review.

Votino filed a *pro se* petition for habeas relief with the superior court.  Votino argued that the imposition of consecutive sentences for assault of the police officers with a deadly weapon and second-degree robbery was a violation of state law and the prohibition against double jeopardy and the court exceeded its jurisdiction in relying on an invalid prior offense to increase his sentence.  The superior court denied relief in a brief, reasoned opinion.

Votino filed a second *pro se* petition for habeas relief with the superior court.  This time, Votino argued that newly discovered evidence demonstrated that he was actually innocent of the robbery and that trial counsel was ineffective for failing to discover that evidence.  Votino additionally requested an evidentiary hearing.  The superior court denied Votino relief in a brief, reasoned opinion.

In his third *pro se* petition to the superior court for habeas relief, Votino raised the same claims he did in his unsuccessful second petition.  Votino again requested an evidentiary hearing. The superior court summarily denied Votino relief.

Votino then filed a *pro se* petition for habeas relief with the Court of Appeal in which he again argued that newly discovered evidence established that he was innocent and that trial

counsel was ineffective for failing to discover such evidence.  Votino renewed his request for an evidentiary hearing.  The Court of Appeal summarily denied relief.

Votino filed a *pro se* petition for habeas relief with the California Supreme Court, again arguing actual innocence and ineffective assistance of counsel and requesting an evidentiary hearing.  The California Supreme Court summarily denied review.

Votino timely filed his Petition with this Court on July 7, 2010.  After this Court granted Votino's motion to stay and abey proceedings pending exhaustion of his claims in state court, Votino filed an Amended Petition on March 26, 2012.

## II. GROUNDS RAISED

In his Amended Petition before this Court, Votino argues that: 1) the trial court erred in instructing the jury on the natural and probable consequences doctrine; 2) the evidence was insufficient to convict him as an aider and abettor under the natural and probable consequences theory of liability because the assaults were not reasonably foreseeable; 3) the court improperly restricted cross-examination of Hopkins; 4) newly discovered evidence proves that he is actually innocent of the robbery; 5) counsel was ineffective for failing to discover the evidence demonstrating his innocence; 6) the imposition of consecutive sentences for assault with a deadly weapon and second-degree robbery violated state law and the prohibition against double jeopardy; and 7) the court exceeded its jurisdiction in relying on an invalid prior strike to enhance his sentence.  Votino additionally requests discovery and an evidentiary hearing "to further develop and obtain evidence sufficient to prove he is actually innocent of robb[ery]."

III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision," *Williams*, 529 U.S. at 412, and not circuit precedent, *see Renico v. Lett*, 559 U.S. 766, 778-79 (2010). The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds and not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  If the last reasoned state court

decision adopts or substantially incorporates the reasoning from a previous state court decision,

this court may consider both decisions to ascertain the reasoning of the last decision.  *Edwards v.*

*Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court reaches a

decision on the merits but provides no reasoning to support its conclusion, a federal habeas court

independently reviews the record to determine whether habeas corpus relief is available under

§ 2254(d).  *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Himes v. Thompson*, 336 F.3d

848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent

state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no reasoned

decision is available, the habeas petitioner still has the burden of "showing there was no

reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 131 S. Ct. 770, 784

(2011).

## IV. DISCUSSION

A.    Natural and Probable Consequences Theory of Liability (Claims 1 & 2)

The jury was instructed pursuant to CALJIC No. 3.00-3.02 that, in order to find Votino

guilty of the 4 assault of an officer charges, it would have to find beyond a reasonable doubt that:

1) a robbery had been committed; 2) Votino aided and abetted the robbery; 3) a co-principal in

the robbery committed the crimes of assault with a firearm on a peace officer; and 4) the crimes

of assault with a firearm and assault with a firearm on a peace officer were the natural and

probable consequence of the commission of the robbery.  Votino asserts that the court erred in

instructing the jury on the natural and probable consequences theory of liability because the

robbery took place nine hours before the assault, the robbery was complete and not ongoing because no proceeds of the robbery were found in the truck at the time of the assaults, and because Woods was an occupant of the vehicle at the time of the assaults but did not take part in the robbery.  Votino further argues that there was insufficient evidence to support his convictions for assault on a peace officer as an aider and abettor under the natural and probable consequences theory of liability because the perpetrator's conduct was not reasonably foreseeable.

The Court of Appeal denied Votino relief on this claims as follows:

Much has been written on the thorny questions that arise when imposing vicarious liability for criminal conduct.  Here we again recite the principles involved when an aider and abettor is found guilty of crimes perpetrated by another.  Anyone who knowingly aids and abets criminal conduct is guilty of not only the intended crime, but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime.  The question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People v. Prettyman* (1996) 14 Cal. 4th 248, 260-262 (*Prettyman*).)

The Supreme Court acknowledges that "[t]o apply the 'natural and probable consequences' doctrine to aiders and abettors is not an easy task.  The jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (*Prettyman, supra,* 14 Cal. 4th at p. 267.)

Here we must address application of the fifth criterion; that is, whether the assaults on the police officers were a natural and probable consequence of the Valero robbery.  The jury was instructed on, and the prosecutor argued, this particular theory of liability.  [Votino] insists the trial court committed reversible error by instructing the jury on the natural and probable consequences doctrine in this context.

"For a criminal act to be a 'reasonably foreseeable' or a 'natural and probable' consequence of another criminal design it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act." (*People v. Nguyen* (1993) 21 Cal. App. 4th 518, 530 (*Nguyen*).)  "The factual determination whether a crime committed by the perpetrator was a reasonably foreseeable consequence of the crime or crimes originally

contemplated is not founded on the aider and abettor's subjective view of what might occur.  Rather, liability is based on an 'objective analysis of causation'; i.e., whether a reasonable person under like circumstances would recognize that the crime was a reasonably foreseeable consequence of the act aided and abetted." (*People v. Woods* (1992) 8 Cal. App. 4th 1570, 1587 (*Woods* ).)  "[I]n determining whether a collateral criminal offense was reasonably foreseeable to a participant in a criminal endeavor, consideration is not restricted to the circumstances prevailing prior to or at the commencement of the endeavor, but must include all of the circumstances leading up to the last act by which the participant directly or indirectly aided or encouraged the principal actor in the commission of the crime." (*Nguyen, supra,* 21 Cal. App. 4th at p. 532.)

It is true, as [Votino] argues, that the target crime and the charged offense must be closely connected.  (*Prettyman, supra,* 14 Cal. 4th at p. 269; *People v. Montes* (1999) 74 Cal. App. 4th 1050, 1055.)  But [Votino] insists on more, urging us to establish a new endpoint to an aider and abettor's liability for the natural and probable consequences of the target crime.  That endpoint, in [Votino's] view, should occur when the target crime is complete.

[Votino] acknowledges he can find no authority for his novel proposition. Nevertheless, he asserts that application of the natural and probable consequences theory to a situation where the robbery is complete before the commission of the charged offense would be an unwarranted extension of the doctrine.  It is [Votino] who seeks to change the governing legal principles.  The question is not the narrow one posed by [Votino] as to whether the target crime is complete, but the broader question framed by the Supreme Court as to whether the charged offense is a reasonably foreseeable consequence of the target offense.  (*People v. Coffman and Marlow* (2004) 34 Cal. 4th 1, 108.)  Neither his robbery nor felony murder cases are apt here because they do not address the dispositive issue of reasonable foreseeability.  We agree with the Attorney General that liability depends not on whether the target offense is complete, but on whether the charged offense was a reasonably foreseeable consequence of the commission of the target offense.

To focus on the factual issue of foreseeability presented to the jury is not to overlook the complexity or the gravity of the vicarious liability tolerated by the natural and probable consequences doctrine.  There are indeed limits on an aider and abettor's liability for the crimes perpetrated by his confederates, and the recent case of *People v. Leon* (2008) 161 Cal. App. 4th 149 (*Leon*) provides a fitting example.

In *Leon,* the defendant, a documented gang member, broke the window of a car parked in a rival gang's territory.  Witnesses observed the defendant and another gang member "messing" with another car and threatened to call the police.  The second gang member looked at the witnesses and fired a gun in the air.  A gang expert testified that theft and witness intimidation benefit criminal street gangs.  (*Leon, supra,* 161 Cal. App. 4th at pp. 153-155.)  The defendant was charged with and convicted of witness intimidation, among other crimes, as a natural and probable consequence of at least one of the targeted offenses: burglary, possession of a concealed firearm by an active

participant in a criminal street gang, or carrying of a loaded firearm by an active participant in a criminal street gang.  (*Id.* at pp. 159-160.)

The court rejected the prosecution's expansive notion of the natural and probable consequences doctrine.  "The People have cited no case, and we are aware of none, in which a court has concluded that the crime of witness intimidation was the natural and probable consequence of either vehicle burglary or illegal possession of a weapon.  There is not 'a close connection' between any of the target crimes Leon aided and abetted, and Rodriguez's commission of witness intimidation.  [Citation.]  In considering 'all of the circumstances surrounding the incident' [citation], the fact that the crimes were gang related and that they were committed in a rival gang's territory clearly increased the possibility that violence would occur.  However, witness intimidation cannot be deemed a natural and probable consequence of any of the target offenses.  [¶]  We conclude that there is insufficient evidence that Leon aided and abetted a crime as to which witness intimidation was a natural and probable consequence."  (*Leon, supra,* 161 Cal. App. 4th at p. 161.)

Similarly, [Votino] asserts there is insufficient evidence that the assaults on the police officers were a natural and probable consequence of the robbery of a gas station clerk several hours earlier.  As in *Leon,* he argues the two crimes were not closely connected.  The problem in *Leon,* however, was not, as here, the passage of time, but the fact that it was not reasonably foreseeable that a confederate would intimidate a witness in the immediate aftermath of a burglary or weapons crime.  [Votino] raises the more difficult question whether assaults on police officers many hours later were foreseeable, particularly when a third party who had not been involved in the robbery joined in.

[Votino] would have us resolve this difficult dilemma as a matter of law.  But the courts consistently hold that the question is a factual one to be resolved by the jury.  (*People v. Cummins* (2005) 127 Cal. App. 4th 667, 677; *Woods, supra,* 8 Cal. App. 4th at p. 1594; *People v. Jones* (1989) 207 Cal. App. 3d 1090, 1095.)  Certainly, there is a point in time at which the connection between the target crime and the charged offense is too attenuated to hold an aider and abettor vicariously liable for the actions of his confederates.  The cases, however, counsel us to take account of all the circumstances surrounding the commission of both the target and charged offenses.  (*Nguyen, supra,* 21 Cal. App. 4th at p. 532; *Leon, supra,* 161 Cal. App. 4th at p. 161.)  The jury is at liberty to assess those circumstances and to make a factual determination whether the charged offense was a natural and probable consequence of the commission of the target offense, and must factor into that calculus the timing of the two offenses.  Nevertheless, the inquiry is case specific and fact intensive.

Thus, although [Votino's] argument to impose some clear end of liability is alluring, he ultimately is stymied, not by the limits of the natural and probable consequences doctrine, but by the limits of appellate review.  The natural and probable consequences doctrine has limits, those circumscribed by the reasonable foreseeability test, but contrary to [Votino's] hopes, the jury, not the Court of Appeal, makes the factual determination and we must affirm the jury verdict if there is substantial evidence, in light of the whole record, to sustain it.  (*People v. Johnson* (1980) 26 Cal. 3d 557, 578.)  We

discern sufficient evidence of foreseeability in the circumstances recounted in the whole record, despite the time lag between the robbery and the assaults.

[Votino] claims a case of mistaken identification, insisting he was not involved in any of the charged offenses.  He told investigating officers he was home and in bed during the Valero robbery.  Despite the fact he was picked up within minutes of, and but a short distance from, the crash and assaults on the police officers, nervous, sweaty, and with gunshot residue on his hands, he explained he was in search of a mechanic or a friend to repair his disabled van.  A van, one officer testified, that could not be found.

Even if we discount Hopkins's identification, the prosecution presented to the jury compelling circumstantial evidence that [Votino] was involved in a three-day crime spree.  The jury was free to accept the prosecution's theory that [Votino] was involved in the initial theft of Brookes's truck, since the same kind of van registered apparently to [Votino's] wife and parked in front of his mother-in-law's residence with the same discolored fender was videotaped driving by the Brookeses' home before the theft and following the truck after the theft.  Thus, there was strong circumstantial evidence [Votino] was involved with his confederate Balverde from the time they stole the truck that was used to commit the armed robberies at the gas stations on the following two days.

The perpetrator of those robberies accosted the gas station clerks at gunpoint and escaped in the same white truck.  Was it reasonably foreseeable to the aider and abettor of an armed robbery that his confederate would use his weapon against police officers to avoid arrest as they cruised through town later in the day in their same stolen truck?  We believe that under all of these circumstances the jury justifiably concluded that [Votino], the aider and abettor, could have reasonably foreseen that Balverde, the armed robber, would assault pursuing police officers alerted by the description of the stolen white truck. The fact that the proceeds of the earlier robbery had been spent or deposited elsewhere does not exonerate [Votino] by ending the natural and probable consequences of continuing to travel around in the same vehicle he and his confederate used to rob the Valero station that very same day.

But enter Aaron Woods.  [Votino] argues that because Woods was not involved in the earlier robbery, the natural and probable consequences doctrine simply does not apply.  He points out that Woods pled guilty to one count of assault on a police officer and admitted using a firearm.  Since Woods was a perpetrator of the assault but not the robbery, [Votino] contends he cannot be held vicariously liable under the natural and probable consequences theory.

If those were the only facts, we would agree with [Votino].  But he ignores the pivotal fact that Balverde was charged with each of the assaults on the police officers and the jury found that he personally and intentionally discharged a firearm in the commission of each assault.  As a result, he too was a perpetrator, both of the assaults and of the robbery.  It was Balverde, not Woods, who was jointly tried with [Votino], and Balverde, not Woods, was described in the jury instructions pertaining to the four counts of assault.  Given the jury findings as to Balverde, Woods is a red herring, and there is substantial evidence to support the jury's findings that [Votino] was guilty of assault on the police officers as a natural and probable consequence of the earlier robbery.

-11-

*Votino*, 2009 WL 1900389, at *3-6.

Votino's claim that the court erred in instructing the jury on the natural and probable consequences theory of liability because the robbery was complete as a matter of law long before the assaults occurred is not reviewable by this Court.  This Court is bound by the state court's determination that the natural and probable consequences doctrine is circumscribed not by whether the target offense was complete at the time of the charged offense, but by whether the charged offense was a reasonably foreseeable consequence of the commission of the target offense.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).  To the extent Votino's claim is reviewable based upon a potential denial of due process, it lacks merit as Votino has not shown that the trial court committed error under state law, much less an error of constitutional magnitude.  *See Spivey v. Rocha*, 194 F.3d 971, 976-77 (9th Cir. 1999) (court's instruction on the natural and probable consequences theory of liability was consistent with California law and did not otherwise violate the defendant's right to due process and a fair trial); *see also Windham v. Merkle,* 163 F.3d 1092, 1104 (9th Cir. 1998) ("The jury was properly instructed that if it was persuaded beyond a reasonable doubt that [petitioner] was guilty as an aider and abettor of the contemplated felonious assaults that were committed against members of a rival gang, he would also be liable for the natural and probable consequences of those acts.  The trial court did not err in reading CALJIC 3.02 to the jury.").

Votino additionally argues that there was insufficient evidence to convict him on the 4 counts of assault against a peace officer with a deadly weapon because the assaults took place 9 hours after the robbery, the robbery and assaults took place in different locations, the robbery was complete at the time of the assaults, and Woods was present in the vehicle at the time of the

assaults but was not a participant in the robbery.  As articulated by the Supreme Court in

*Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443

U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-

33 (2010) (reaffirming this standard).  This Court must therefore determine whether the

California court unreasonably applied *Jackson*.  In making this determination, this Court may not

usurp the role of the finder of fact by considering how it would have resolved any conflicts in the

evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.

Rather, when "faced with a record of historical facts that supports conflicting inferences," this

Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact

resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the

deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency

review.  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our

federal system is "that a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

*Bradshaw*, 546 U.S. at 76.

Determination of whether a crime is the natural and probable consequence of a target crime involves an objective, factual analysis. *People v. Prettyman,* 926 P.2d 1013, 1039 (Cal. 1996). Here, Balverde had already fired shots at Hopkins, who chased Balverde and Votino as they were fleeing the robbery in the stolen truck. A jury could have reasonably concluded that it was objectively foreseeable that the police would accost them since they continued to drive around town in the same stolen truck used in the robbery, and that where Balverde used his firearm to elude pursuit once, he would do it again. The Court of Appeal's determination that there was sufficient evidence to support Votino's assault convictions was not unreasonable or contrary to federal law. Votino is therefore not entitled to relief on this claim.

B. Cross-examination of Hopkins (Claim 3)

Votino next argues that that his Sixth Amendment right to confrontation was denied when the court improperly restricted his cross-examination of Hopkins.

The Court of Appeal denied Votino relief on this claim, concluding as follows:

> A defendant's right to confront witnesses who testify against him with searing and comprehensive cross-examination is one of the fundamental hallmarks of our criminal justice system, and therefore we must scrupulously examine a criminal defendant's allegation that his right to cross-examination has been restricted, circumscribed, or compromised. We confront such an allegation here.
> [Votino] complains that the trial court improperly restricted his cross-examination of the percipient witness, Marcus Hopkins. Hopkins was the Valero employee who witnessed the robbery and pursued the assailants as they sped off with their loot in the stolen white truck. Having reviewed the transcript of his testimony, it goes without saying that his credibility was thoroughly tested and the flaws in his identification testimony were exposed. Nevertheless, the question remains whether the trial court improperly limited impeachment by refusing to allow evidence of a series of misdemeanors and prior testimony in other cases. We conclude there was no abuse of discretion.
> [Votino] sought to impeach Hopkins with misdemeanors he asserted involved moral turpitude, including a 1990 conviction for theft, 1994 convictions for false imprisonment and corporal injury on a cohabitant, a 1995 conviction for petty theft, a 1996 conviction for escape, and a 1997 conviction for criminal threats, as well as 2001

felony convictions for stalking, criminal threats, possession of a weapon, and unlawful sexual intercourse.  The court exercised its discretion to disallow investigation into the facts surrounding the commission of the misdemeanors and limited [Votino] to examination of the conduct involving the commission of the two more recent felonies, just as it had limited the prosecution to only two felonies to impeach codefendant Balverde.  The court also allowed [Votino] to inquire about several other cases in which Hopkins had testified and to ask whether he had ever made a mistaken identification.  The court would not allow [Votino], however, to call additional witnesses who would challenge the identifications and thereby devolve into a collateral trial within a trial.

"'"[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.  Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." [Citation.]' [Citation.]"  "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

[Votino] highlights the importance of Hopkins's testimony, suggesting that unabated impeachment was particularly necessary because he was the sole witness to identify him.  Such a key prosecution witness, in [Votino's] view, must be subject to rigorous cross-examination.  We agree on the importance of cross-examination, perhaps more so when a sole eyewitness is involved, but we disagree that meaningful cross-examination was foreclosed here.

Hopkins's powers of observation were tested throughout his examination, not to mention his credibility and his memory.  Defense counsel deftly exposed inconsistencies in his testimony, challenged his motivation for testifying, and asked penetrating questions about his testimony in other cases.  He examined him about his prior felony convictions.  Thus, we cannot say the court abused its discretion by disallowing redundant examination about his old misdemeanor convictions.  The jury was well aware Hopkins, a convicted felon, had been inconsistent in his descriptions and identifications.  To add a number of misdemeanor convictions would not have changed the impression or further degraded his veracity.  Indeed, the trial court could reasonably conclude that the detour into collateral matters would not be sufficiently probative to justify the undue length of trial time.

Nor did the trial court abuse its discretion by limiting the examination of Hopkins regarding his testimony in other cases.  Again, the trial court allowed defense counsel considerable leeway to explore Hopkins's prior testimony.  Counsel was allowed to ask whether Hopkins had positively identified the defendants in several cases.  We cannot squabble with the court's reasonable curtailment of bringing in additional witnesses whose own identifications would be subject to challenge.  Given that these matters concerned other trials, at least one of which dated back to 1990, we simply cannot conclude the trial court abused its discretion by carefully and narrowly circumscribing Hopkins's cross-examination.

*Votino*, 2009 WL 1900389, at *6-8 (internal citations omitted).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI.  It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding that due process rights are not violated by the exclusion of relevant evidence where the probative value is outweighed by the danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against

-16-

admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Here, Votino had an opportunity to extensively cross-examine Hopkins about any potential biases, inconsistencies, or other infirmities—and did so.  The court equally limited impeachment by both the prosecution and defense.  The court acted well within its discretion and within the bounds of the Confrontation Clause in determining that introducing extrinsic evidence to contradict Hopkins's eyewitnesses identifications used in prior cases could confuse the issues and potentially devolve into a mini-trial on collateral matters.  *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence"); *see also Fenenbock v. Dir. of Corr. for California*, 692 F.3d 910, 921 (9th Cir. 2012) (petitioner not entitled to habeas relief where he cited to no Supreme Court authority recognizing a right to impeachment via extrinsic evidence relating to the truth of a collateral out-of-court statement). Defense counsel thoroughly cross-examined Hopkins about his credibility, memory and observations.  As the Court of Appeal noted, defense counsel exposed inconsistencies in Hopkins's testimony, challenged his motivation for testifying, and asked penetrating questions about his testimony in other cases.  The Court of Appeal's conclusion that Votino was not denied his right to confrontation was not unreasonable or contrary to federal law.  Votino thus cannot prevail on this claim.

C.  Actual Innocence and Failure to Discover New Evidence (Claims 4 & 5)

Votino next argues that newly discovered evidence demonstrates that he is actually innocent of the robbery.  Specifically, Votino argues that a CD showing the truck outside the gas mart from 16 different camera angles, which was played for the jury at trial, should be analyzed by an expert to determine if a photo of the driver can be extracted.  In a post-trial proceeding, Votino, who was proceeding as his own counsel at that point, claimed that he had contacted a Colorado company who stated that it was possible, although not guaranteed, that it could extract a photo of the driver, and that the extraction would cost $12,000.  The court stated that whether it was possible to pull a photo of the driver from the video might be relevant to an ineffective assistance of counsel claim if counsel had at the time of trial the resources to hire expert analysis of the tapes.  The court stated that it would not pay for expert analysis of the video, instead suggesting that Votino contact his investigator who could help him determine, either with Votino's personal funds or funds provided to the investigator by the state, if it were possible to pull a video from the driver without spending the entire $12,000 to actually complete the analysis.  Votino never obtained any evidence that an extraction was possible.  He also claims his trial counsel was ineffective for failing to hire an expert to extract a photo of the driver from the CD.

Votino also argues that in July of 2010, a fellow inmate named Alfredo Tafoya told him that while Tafoya was incarcerated in the San Joaquin County Jail, an inmate named Santos Real stated that "he and his homeboy" committed the robbery in question in the stolen truck.  He further asserts that the forensic analyst who processed the truck six days after the robbery and after it had been towed found only palm prints on the truck, and they did not match Balverde,

Woods, or Votino.  Votino requests an evidentiary hearing and discovery so that he can "further

develop and obtain evidence sufficient to prove he is actually innocent of [the] robb[ery]."

Votino raised these claims in his second *pro se* petition for habeas relief with the superior

court.  The superior court denied relief as follows:

> [Votino] brings this second post-appeal habeas petition on the grounds that (1) newly discovered evidence points to his innocence for the Valero gas station robbery; (2) the unidentified palm prints taken from the pick up truck should be re-examined to see if they match those of the person who allegedly admits participating in the robbery; and (3) [Votino] should be given access to the CD of Valero security camera images so they can be examined to prove he was not the pickup driver in that robbery.
>
> The petition fails because the newly discovered evidence [Votino] submits is a declaration by inmate Tafoya that a third person, Real, spontaneously admitted to him (while they were both incarcerated at DVI) that he was the driver of the truck used in the Valero robbery.  Other than the declaration, the Petition offers no evidence of Real's presence at the robbery and Real's statements offered are not sufficiently reliable to overcome their status as inadmissible hearsay.  The declaration also fails to undermine the entire prosecution case and point unerringly to Petitioner's innocence or reduced culpability.  Accordingly, it provides an insufficient basis to order re-examination of the palm prints found in the truck.
>
> The CD which [Votino] requests to be re-examined to extract photos of the Valero robbery truck driver's face was made available to [Votino] at trial and for purposes of his motion for a new trial, but [Votino] apparently failed to obtain the images he wanted for purposes of his new trial motion, despite his attempts to do so.  Ultimately, the trial court declined to give him a further continuance of his new trial motion to extract the images [he] seeks.  [Votino] fails to explain why this issue could not have been raised before now.

While a federal habeas petitioner may assert a claim of actual innocence to overcome a

procedural bar to review, *Schlup v. Delo*, 513 U.S. 298, 326 (1995), or to overcome AEDPA's

one-year statute of limitations, *McQuiggin v. Perkins*, __U.S.__, 133 S. Ct. 1924, 1928 (2013),

the Supreme Court has not resolved whether a non-capital prisoner may be entitled to habeas

relief based on a freestanding claim of actual innocence, *McQuiggin*, 133 S. Ct. at 1931; *see*

*House v. Bell*, 547 U.S. 518, 554-55 (2006); *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 71-

72 (2009).  The Supreme Court has instead declined to answer the question, noting that where

"[p]etitioner has failed to make a persuasive showing of actual innocence[,] . . . the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence." *Herrera v. Collins*, 506 U.S. 390, 427 (1993) (O'Connor, J., concurring).

Assuming, but not deciding, that a freestanding actual innocence claim is cognizable in a § 2254 proceeding, the Supreme Court has described the threshold showing of evidence as "extraordinarily high." *Herrera*, 506 U.S. at 417. The Ninth Circuit has held that "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000) (quoting *Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir. 1997)).

Measured against this standard, Votino has fallen short of establishing his actual innocence. Votino failed to provide evidence that it was even possible to pull a photo of the getaway driver from the videotape presented at trial. And although Tafoya declared that he would be prepared to testify that Real took responsibility for the robbery and assault, his testimony would be inadmissible hearsay and, while it might cast doubt on Votino's guilt, is insufficient to establish that Votino is probably innocent. *See Jackson*, 211 F. 3d at 1165. Consequently, he not entitled to relief on this ground.

Votino requests that this court appoint an investigator and order discovery and an evidentiary hearing so that he can follow these "leads" and prove that he is in fact innocent. Votino states that an investigator could locate Real to ask if he will admit to being the getaway driver, extract photos of the driver from the CD and compare it to his booking photo and to

Real's booking photo, compare the palm prints taken from the white truck to Real's prints, and subpoena Tafoya, Real and Balverde to testify that Real was the real getaway driver.

"To obtain an evidentiary hearing in district court, a habeas petitioner must, in addition to showing diligence in state court, allege a colorable claim for relief." *West v. Ryan*, 608 F.3d 477, 485 (9th Cir. 2010) (citing *Schriro v. Landrigan*, 550 U.S. 465, 474-75 (2007); *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005)). To allege a colorable claim, he must allege facts that, if true, would entitle him to habeas relief. *Landrigan,* 550 U.S. at 474. Thus, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations," and whether those allegations, if true, would entitle him to relief. *Id.* "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Furthermore, because the AEDPA's deferential standards "control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.*; *see also Earp,* 431 F.3d at 1166-67.

Votino did not receive an evidentiary hearing in state court to find facts relevant to the allegedly newly-discovered evidence. Nevertheless, he is not entitled to an evidentiary hearing now because even if the newly-discovered evidence proves to be true, he would not have made out a valid freestanding claim of actual innocence by "affirmatively prov[ing] that he is probably innocent." *Jackson*, 211 F. 3d at 1165; *see also Herrera,* 506 U.S. at 417-19. Again, Votino failed to present any evidence at the trial level that extraction of a photo was even possible. And if truthful, the testimony of Real coupled with the finding of his fingerprints on the truck would at most cast doubt on Votino's guilt. It would not be sufficient to establish that Votino is

probably innocent where an eyewitness identified him as a participant in the robbery and he was accosted shortly after the assaults near the scene of the crime with gunshot residue on his hands.

Lastly, he cannot establish that trial counsel was ineffective for failing to hire an expert to extract a photo of the driver from the videotape which defense counsel had been provided and which was shown to the jury at trial.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  Again, Votino failed to provide a statement that extraction of such a photo was even possible.  Thus, he has failed to show that counsel's performance was deficient in this regard.  *See id.* (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

D.  Imposition of Consecutive Sentences (Claim 6)

At his sentencing hearing, Votino argued that because aiding and abetting the robbery and the assaults on the officers constituted a "continuing course of conduct, a continuing conspiracy," he should be sentenced concurrently on those counts.  Votino suggested that consecutive sentences would violate California Penal Code § 654, which precludes multiple punishments for a single act or omission or an indivisible course of conduct.  CAL. PENAL CODE § 654(a); *People v. Deloza*, 957 P.2d 945, 948 (Cal. 1998).  The court responded, "It's not a 654 issue."  The court imposed the middle term of 6 years on Count 1, assault with a deadly weapon against a police officer.  The court imposed six-year terms on Counts 2-4, the remaining convictions for assault with a deadly weapon against a peace officer, to run concurrently with Count 1.  The court sentenced Votino to, *inter alia*, one year on Count 10, second-degree

-22-

robbery, and concluded that because second-degree robbery was a "serious crime," state law mandated that the sentence be imposed consecutively.  The court doubled all terms pursuant to California Penal Code § 1170.12(B).

Votino argues that the imposition of consecutive sentences on Counts 1 and 10 violates California Penal Code § 654 and the prohibition against double jeopardy because they constituted multiple punishments for the same offense.  He claims that since he was convicted on a theory that the assaults were a natural and probable consequence of the robbery, the robbery and the assaults constituted a "single transaction" for sentencing purposes.  Votino raised this claim in his first *pro se* petition for habeas relief filed with the superior court.  The superior court concluded that Votino failed to state a claim for relief because he did not provide documentary evidence to support his claim, such as transcripts of the sentencing hearing.

Votino's claim that his sentence violated California Penal Code § 654 is not reviewable by this Court because it is purely a matter of state law.  *Watts v. Bonneville*, 879 F.2d 685 (9th Cir. 1989).  The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  The clause is enforced against the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969).  The Supreme Court has previously held that this clause protects against successive prosecutions for the same offense after acquittal or conviction and against multiple criminal punishments for the same offense.  *Monge v. California*, 524 U.S. 721, 727-28 (1998) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).  The prohibition against multiple punishments "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature."  *Ohio v. Johnson*, 467 U.S. 493,

499 (1984).  Whether punishments imposed in a single trial are "multiple" for purposes of double jeopardy is essentially an issue of legislative intent.  *See Missouri v. Hunter*, 459 U.S. 359, 366-68 (1983).  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Blockburger v. United States,* 284 U.S. 299, 304 (1932).

Applying the *Blockburger* test, assault of a police officer with a deadly weapon and second-degree robbery are distinct and separate offenses under California law.  Count 10, second degree robbery, requires proof of an element that Count 1 does not—the taking of the personal property of another.  CAL. PENAL CODE § 211.  Conversely, Count 1 requires proof of an element that Count 10 does not—assault against a peace officer.  CAL. PENAL CODE § 245(d)(1).  Accordingly, even if these crimes were committed with the same objective—to get away with a robbery—they do not constitute the same offenses for which the imposition of consecutive sentences would violate the prohibition against double jeopardy.  Votino thus cannot prevail on this claim.

E.  Reliance on an Invalid Prior Strike (Claim 7)

At his sentencing hearing, Votino argued that the court should strike one of his prior strikes because he committed the underlying offense when he was young and on drugs and because he wanted "another chance out there."  The court denied the motion to strike.  In his first *pro se* petition for habeas relief filed with the superior court, Votino argued that his 1993 conviction was invalid as a prior strike and could not be used to enhance his sentence because he

-24-

did not voluntarily and intelligently waive his constitutional rights when he pled guilty in 1993.

The superior court denied him relief as follows:

> [Votino's] asserted "fair recollection" that nobody explained his constitutional rights to him prior to his plea.  As [Votino] fails to note in the Petition, he pled guilty in 1993 to a reduced charge of voluntary manslaughter *in the face of imminent retrial after his first hung jury*.  He was represented at that first trial and during his plea.  Repeatedly noting that [Votino] had just sat through trial on his 1993 charges, the trial court explained each of the rights [Votino] was giving up by pleading guilty, obtained [Votino's] admission that he understood each of the rights he was giving up and obtained his voluntary relinquishment of each of those rights.

This Court may not grant Votino relief on his claim.  The United States Supreme Court has held that if a prior conviction used to enhance a state sentence is no longer open to direct or collateral attack in its own right because the petitioner failed to or unsuccessfully pursued those remedies, the petitioner may not collaterally attack his prior conviction in a § 2254 petition for habeas relief.  *Lackawanna County Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001); *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 443 (9th Cir. 2007).  An exception to that rule is where there was a failure to appoint counsel in violation of the Sixth Amendment in that prior proceeding.  *Lackawanna*, 531 U.S. at 404.  That exception does not apply here because, as the superior court found, Votino was represented by counsel during his initial trial which resulted in a hung jury and his subsequent plea.  Votino is therefore not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Votino is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 5, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge